**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NELSON EDWARDS, SHERRI L. EDWARDS, SHAWNA F. EDWARDS, and SHAWNA A. WALKER, Minor, by Parent, SHAWNA F. EDWARDS, | ) ) ) ) ) | |
| | ) | Case No. 13 CV 04558 |
| Plaintiff(s), | ) ) | JUDGE JORGE L. ALONSO |
| v. | ) ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL JOLLIFF-BLAKE, ARTURO V. BRACHO, ANDREW J. BELUSO, CARLOS A. SANCHEZ, ALEJANDRO LAGUNAS, SHERRY L. BUCKNER, ANTONIO HERRERA, D MICHAEL A. CANTORE, RICO L. CARTER, DARIUS J. REED, EDWARD J. SULLINS, UNKNOWN OFFICERS OF THE CHICAGO POLICE DEPARTMENT, and CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant(s). | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1
STATEMENT OF FACTS**

Defendants, Jolliff-Blake, Bracho, Beluso, Buckner, Sanchez, Lagunas, Herrera, Cantore, Carter, Reed, Sullins, and Skipper ("Defendant Officers"), and City of Chicago ("City"), by and through their attorneys, Leinenweber, Baroni and Daffada, LLC, submit this response to Plaintiff's Local Rule 56.1 Statement and state:

**Description of the Parties**

1.     Plaintiffs, Nelson D. Edwards, Sherri L. Edwards, Shawna F. Edwards, and Shawna A. Walker, Minor, by Parent, Shawna F. Edwards, were and are citizens of the United States and reside within the jurisdiction of the court. *Doc. 187, Third Am. Compl., at ¶ 5 (No Answer)*.

**RESPONSE: Undisputed**.

2.     At all times mentioned in plaintiffs' complaint, defendants, Michael Jolliff-Blake, Arturo V. Bracho, Andrew J. Beluso, Carlos A. Sanchez, Alejandro Lagunas, Sherry L. Buckner, Antonio Herrera, Michael A. Cantore, Rico L. Carter, Darius J. Reed, Edward J. Sullins, an Neil J. Skipper, were officers in the Chicago Police Department and were acting under color of state law and as employees or agents of the City of Chicago, Illinois.  *Doc. 187, Third Am.Compl., at ¶ 7 (No Answer[1]); Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 1, 2.*

**RESPONSE:  Undisputed**.

3.     Defendant City of Chicago is a municipal corporation, duly organized under the laws of the State of Illinois. Defendant City of Chicago maintained, managed, and/or operated the Chicago Police Department.  *Third Am. Complaint ¶ 8 (No Answer).*

**RESPONSE:  Undisputed**.

Jurisdiction and Venue

4.     This action arises under the United States Constitution and the laws of the United States, specifically the Civil Rights Act of 1871 (42 U.S.C. § 1983), to redress alleged deprivations of the civil rights of plaintiffs through acts and/or omissions of defendants committed under color of law. Defendants are alleged to have deprived plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is based upon 28 U.S.C. §§ 1343, 1331, and 1367, and venue lies in the United States District Court, Northern District of Illinois, pursuant to 28 U.S.C. §1391, because all events or omissions giving rise to this claim occurred in this district.  *Doc. 187, Third Am. Complaint ¶ 1, 3, 4 (No Answer).*

**RESPONSE:  Undisputed**.

Undisputed Material Facts of the Case

The Edwards family

5.     Nelson D. Edwards was 72 years old on June 20, 2012, having retired from the University of Illinois at Chicago in 2001 after working as a truck laborer for 31 years, and he had owned the single-family home at 827 South Keeler Avenue, Chicago, Illinois for 41 years, buying it in 1971.  *Doc. 187, Third Am. Complaint ¶ 9 (No Answer[1]); Jt Exhibit C (N Edwards' Dep Tr) at 6-9.*

**RESPONSE:  Defendants object to this assertion of fact as it is nether relevant or material to the outcome of the summary judgment motion.** *See Malec v. Sanford,* **191**

F.R.D. 581, 583. (N.D. Ill. 2000)[1]. **Subject to and without waiving the objection, Defendants do not dispute this statement.**

6.     Nelson D. Edwards' two middle-aged daughters, Sherri L. Edwards and Shawna F. Edwards, and his minor granddaughter, Shawna A. Walker (12 years old in June 2012), all lived with him at 827 South Keeler Avenue, Chicago, Illinois, on June 20, 2012. *Jt Exhibit D (Sherri Edwards' Dep Tr) at 5; Jt Exhibit E (Shawna Edwards' Dep Tr.) at 5; Jt Exhibit F (S. Walker Dep Tr) at 5.*

**RESPONSE:  Undisputed**.

7.     Nelson D. Edwards, Sherri L. Edwards, Shawna F. Edwards, and Shawna A. Walker were never suspected of any criminal activity and they were not targets of the search warrant. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 74.*

**RESPONSE:  Defendants object to this assertion of fact as it is nether relevant or material to the outcome of the summary judgment motion. Without waiving this objection, Defendants do not dispute that Nelson D. Edwards, Shawna F. Edwards, and Shawna A. Walker were not targets of the search warrant. The reference to Nelson D. Edwards, Shawna F. Edwards, and Shawna A. Walker never being suspected of any criminal activity is not supported by the record and should be disregarded.**

The Search Warrant and Complaint

8.     On June 20, 2012, at 9:30 PM, defendants Chicago police officers Michael Jolliff- Blake, Arturo V. Bracho, Andrew J. Beluso, Carlos A. Sanchez, Alejandro Lagunas, Sherry L. Buckner, Antonio Herrera, Michael A. Cantore, Rico L. Carter, Darius J. Reed, and Edward J. Sullins entered and searched thoroughly the Edwards home at 827 South Keeler, Chicago, Illinois, pursuant to Search Warrant 12 SW 6213, based on information about a drug sale by a "Freddy Sutton" allegedly given by a "John Doe" witness to defendants on June 16, 2012, said warrant being approved by Lt. Neil J. Skipper on June 16, 2012, and signed by Judge Gloria Chevere on June 17, 2012. *Jt Exhibit A (Search Warrant); Jt Exhibit B (Complaint for Search Warrant); Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 3, 5, 6, 52, 53, 54, 55.*

**RESPONSE:  Defendants dispute the John Doe "allegedly" provided information**

---

[1] Objections made throughout this Response based on relevance and materiality are pursuant to *Malec v. Sanford*, 191 F.R.D. 581, 583. (N.D. Ill. 2000)

**about the drug sale, and further, this assertion of fact is not supported by the record and**

**should be disregarded. The J. Doe actually provided the information. (Joint Ex. A, B). The**

**remaining facts in this statement are not disputed.**

The "John Doe" Witness

9.      The "John Doe" witness was using 10 - 15 bags of heroin a day in 2012, when his addiction was at its peak, and at his July 8, 2015, deposition he said, "I devote my life, morning to night, every single day, to make sure that I have a bag of heroin to survive," and also "I have to worry about where the next ten dollars is going to come for my next bag of dope. Because if I don't have the dope, I am so sick," and " . . . so sick to where if you had a loaded gun next to your bed, you would stick it in your mouth and pull the trigger . . . and just blow your brains out." *Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 82-83, 85; Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 140; Pls Exhibit 3 ("John Doe" confession).*

**RESPONSE:  Defendants object to this assertion of fact as being nether relevant**

**or material to the outcome of the summary judgment motion. Stating further, the J.**

**Doe's testimony regarding his life struggles with heroin addiction are immaterial to**

**involvement with the 2012 Search Warrant. Subject to and without waiving the**

**objection, Defendants do not dispute the J. Doe testified as cited.**

10.      When he was 17 years old, the "John Doe" witness was diagnosed as being bipolar, and being afflicted with seizures and Attention-Deficit/Hyperactivity Disorder (ADHD), and he has also been diagnosed as having anxiety, and is on various medications: Dilaudid (a narcotic), Neuronton, Baclofen, Amitriptyline, Ambien, Heparin, and Promethazine. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 6-7; Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 95-97.*

**RESPONSE:  Defendants object to this assertion of fact as it is nether relevant or**

**material to the outcome of the summary judgment motion. Stating further, whether the J.**

**Doe was diagnosed bipolar, with ADHD or suffered from seizures and anxiety when he**

**was 17 years old, or that he was on medications at the time of his 2015 depositions, are**

**irrelevant and immaterial to his involvement in connection with the 2012 Search Warrant.**

**Subject to and without waiving the foregoing objections, Defendants do not dispute the J.**

Doe testified to the facts asserted in this paragraph during his depositions.

11. In February of 2012, the "John Doe" witness was arrested with his brother [name known but redacted] for dishonesty, that is, identity theft and stealing thousands of dollars through bank fraud from his mother [name known but redacted], who lives in Tinley Park, Illinois, a crime to which he confessed and which was on his Chicago Police Department criminal record. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 116-19*; *Pls Exhibit 1 ("John Doe" crim history); Pls Exhibit 3 ("John Doe" confession).*

**Response: Defendants object to this entire statement as irrelevant and immaterial to the determination of summary judgment. Defendants' further object to and dispute Plaintiffs' characterization that the J. Doe was arrested for the crime "dishonesty" as it is neither supported by the record and is argumentative. Defendants do not dispute the J. Doe was arrested in February 2012 and confessed to "Identity Theft" under Illinois Statute 720-5/16G-15(a)(1). (Pls. Exhibit 1, J. Doe Criminal History).**

12. At deposition, the "John Doe" witness acknowledged the identity theft and admitted to signing the confession, but he also claimed to the contrary that his parents died in Hurricane Katrina in Louisiana in 2005, that [name redacted] was not his mother, and that he never had a brother named [name redacted]. *Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 47-48*; *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 116-19.*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Defendants' also object to the statement "he also claimed to the contrary" as argumentative. Subject to and without waiving the objection, Defendants do not dispute the "John Doe" witness acknowledged the identity theft and admitted to signing the confession.**

13. In his police confession in February 2012, the "John Doe" witness stated that he attended high school at Alan B. Shepard High School in Palos Heights, Illinois, Summit Learning Center in Robbins, Illinois, and Ombudsman in Crestwood, Illinois, but at his deposition he said he attended Woodlawn High School in New Orleans, Louisiana, near the French Quarter, a high school that does not exist. *Pls Exhibit 3 ("John Doe" confession); Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 49; Government Website at http://opsb.us/schools.*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and**

**immaterial to the determination of summary judgment. Subject to and without waiving**

**this objection, Defendants do not dispute that Pls Exhibit 3 states the J. Doe attended**

**high school at Alan B. Shepard High School in Palos Heights, Illinois, Summit Learning**

**Center in Robbins, Illinois, and Ombudsman in Crestwood, Illinois. Defendants dispute**

**Woodlawn High School in Louisiana does not exist. It is located in Baton Rouge, just**

**outside of New Orleans. https://en.wikipedia.org/wiki/Woodlawn_High_School**

14.  In June of 2012, the "John Doe" witness was using 10 - 15 bags of heroin a day, was severely addicted, living from hit to hit, was panhandling to make money, and was homeless, living in a vacant, boarded-up, abandoned house on South Karlov in Chicago, Illinois.  *Jt Exhibit S-1("John Doe" Dep Tr II - under seal) at 24; Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 140.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and**

**immaterial to the determination of summary judgment. Subject to and without waiving the**

**objection, Defendants do not dispute this statement.**

15.  At his depositions, the "John Doe" witness was clearly under the influence of drugs, confused, hostile, and so lethargic that he kept falling asleep; while he said in an earlier deposition that he had pancreatic cancer, he later said that he was not receiving any treatment and was not taking any medication for this very serious cancer. *E.g., Jt Exhibit S-2 (Video of "John Doe" Dep Tr II - under seal) at 00:00-40:42; Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 106-07.*

**RESPONSE:  Defendants move to strike this entire statement as argumentative**

**and improper under L. Rule 56.1(a)(3) which requires a *only* factual allegations pertinent**

**to the outcome of the summary judgment motion. Plaintiffs' Counsel's speculation and**

**opinion of the J. Doe's state of health and mind 3 years after the search warrant was**

**obtained is not relevant.**

**Subject to and without waiving the objection, do not dispute J. Doe testified he**

**had cancer which he later testified he was no longer being treated. Defendants dispute J.**

**Doe was under the influence of drugs or confused. (Joint Ex. S-1, 8:6-7; Joint Ex. S-5,**

**106:8-10). Defendants' dispute J. Doe was hostile, stating further any assertive reactions by J. Doe during his three (3) depositions, which he appeared without counsel, was mainly the product of badgering by Plaintiffs' counsel.**

16.    The "John Doe" witness's depositions were held in three installments: on June 2, 2015, after 40+ minutes of questioning during which he kept falling asleep, the "John Doe" witness declared abruptly that he was having an anxiety attack and was done answering questions, and on July 8, 2015, after one hour and twelve minutes of questioning, he declared again that he was not answering any more questions and walked out. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 39-40; Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 97-98.*

**RESPONSE: Defendants move to strike this entire statement as improper under L. Rule 56.1(a)(3) which requires factual allegations pertinent to the outcome of the summary judgment motion. Subject to and without waiving this motion, Defendants do not dispute this statement.**

17.    The "John Doe" witness was featured in a BBC documentary on heroin addicts in Chicago, Illinois, in which he was paid by a British reporter to narrate and show the reporter how he buys heroin from a dealer and then how he injects himself and shoots up the heroin. *Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 59-64.*

**RESPONSE: Defendants move to strike this entire statement as improper under L. Rule 56.1(a)(3) which requires only factual allegations pertinent to the outcome of the summary judgment motion. Subject to and without waiving this motion, Defendants do not dispute this statement.**

<u>Frederick Sutton and his home at 3938 West Lexington Street</u>

18.    Frederick Sutton has lived at 3938 West Lexington Street, in Chicago, Illinois for over 40 years, his entire life, and has never lived or stayed at 827 South Keeler Avenue, in Chicago, Illinois, which is ½ mile away from his home, and Mr. Sutton never ran a heroin operation out of the basement of that home. *Doc. 187, Third Am. Complaint ¶ 11 (No Answer[1]); Pls Exhibit 8 (F Sutton Declaration); Pls Exhibit 9 (Google Map of Area).*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving**

the objection, Defendants dispute this statement in part, and do not dispute part of this statement. Defendants do not dispute Freddy Sutton lived at 3938 West Lexington Street for over 40 years. Defendants dispute 827 Keeler is ½ mile away from 3938 West Lexington Street. Responding further, Defendants state that the distance is 4 tenths of a mile. (Defendants' Ex. 2, Google Map with Distance; Defendants' Ex. 3, Declaration of Fredrick Sutton). Defendants dispute that Freddy Sutton never ran a heroin operation and lived or stayed at 827 S. Keeler Avenue. J. Doe testified repeatedly that he bought heroin from Freddy Sutton at the house on the corner of Arthington and a K Street (827 Keeler) - where Freddy, in part, ran his heroin operation - the only house with dog pens and on the corner in the neighborhood. "It would have to be Karlov or Keeler or it would have to be a K street. . . ." (*See* Joint Ex. S-1, 25:16-24, 26:13-25, 27:1-6, 27:16-18, 28:1-10, 31:6-15, 32:6-19; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20).

19. When preparing the search warrant, defendant officer Michael Jolliff-Blake had Frederick Sutton's criminal history in his possession, which chronicles 30 arrests, mostly drug- related, with 3938 West Lexington, Chicago, Illinois, listed as Mr. Sutton's home address ever since his first arrest in 1988. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 15, 16; Pls Exhibit 1 (F Sutton crim history); Jt Exhibit G-5 (Jolliff-Blake Dep Tr III) at 152-57.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants do not dispute this statement.**

20. The "John Doe" witness identified a picture of 3938 West Lexington Street as appearing to be the house where "Fred" kept his heroin and where he sold it, either in front of the house or in the lot to the side towards Pulaski. *Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 90-92; Pls Exhibit 1 (Picture of F Sutton home, 3938 West Lexington).*

**RESPONSE: Defendants object to this assertion of fact as it does not accurately**

reflect J. Doe's testimony and is misleading. **Without waiving this objection, Defendants dispute this statement. This statement takes the J. Doe's testimony out of context and is incomplete. J. Doe testified that he did not know whether or not he recognized the house [3938 West Lexington] in the photo. Further, J. Doe testified the house in picture [3938 West Lexington] was not the same house where he bought heroin from Sutton,** *i.e.* **"[t]his is not the house I bought heroin from," and does not know who lives in this house. (Joint Ex. S-3, 90-92).**

<u>Frederick Sutton and the drug house on other corner one block away</u>

21.    Frederick Sutton was at 749 South Keeler Avenue, Chicago, Illinois, a house on the corner of South Keeler Avenue and West 5th Avenue, one block north of 827 South Keeler Avenue, when he learned that the police had raided the Edwards home at 827 South Keeler Avenue, looking for him. *Pls Exhibit 8 (F Sutton Declaration); Pls Exhibit 9 (Google Map of Area).*

**RESPONSE:  Defendants do not dispute that Freddy Sutton was on the north end of the Keeler block, about 300 feet from the Edwards' residence, on the night the search warrant for the Edwards' home was executed and learned that the police were looking for him from Andre Sims, an Edwards' neighbor. (Defendants' Ex. 3, Fredrick Sutton Declaration; Joint Ex. W, 21:15-25, 19:14-16, 21:15-20). Defendants dispute that 749 Keeler is on the corner of South Keeler and Fifth Avenue as there are two vacant lots separated by an alley between 749 South Keeler and Fifth Avenue. (Defendants' Ex. 4, Google photo showing the distance between 749 South Keeler and Fifth Avenue).**

22.   The "John Doe" witness identified a picture of 749 South Keeler Avenue as the house where they sell "weed" and where he has seen "Fred" coming off the porch with his heroin. *Jt Exhibit S-3 ("John Doe" Dep Tr II - under seal) at 87-89; Pls Exhibit 5 (Picture of Drug House at 749 South Keeler).*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants dispute this assertion of fact. J. Doe testified in his second deposition he thought 749 Keeler was a house where they sell "weed" and that he has seen "Fred coming "off the porch, maybe walk to this house, to the next house," with heroin. (Joint Ex. S-3, 87-89).  In his third deposition, J. Doe testified it looks like the house where he used to buy weed, but could not remember. (Joint Ex. S-5, 148:1-25, 149:1-2).  Stating further, this fact is taken out of context of the entirety of the J. Doe testimony and is a distortion of the record. J. Doe went on to testify that this house, [749 South Keeler], is approximately three to four houses down from the house with dog kennels in the back yard [827 Keeler] where he bought the dope. (Joint Ex. S-3, 88:9-14). J. Doe also testifies later that he does not remember if 749 South Keeler is the house where he used to buy weed. (Joint Ex. S-5, 148:1-25, 149:1-2). J. Doe states unequivocally that the house where he bought the heroin was "not tall like that" and the [heroin] house was directly on Arthington. "[E]verybody knew the dog pens in the backyard. That's – say we're going to – if you tell somebody say, you want to but dope from Fred?" Be like, yeah. Are you going to the dog pens? . . .  That's how everybody knew where it was." (Joint Ex. S-5, 149:7-24).**

23.   In 2010, before the raid on the Edwards home, defendants Jolliff-Blake and Andrew Beluso raided the house on the corner of South Keeler Avenue and 5th Avenue, that is, 749 South Keeler Avenue[2], one block north of 827 South Keeler Avenue, with a search warrant for drugs, and confiscated heroin and crack cocaine in the search. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 120- 24, 287-88.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial**

**to the determination of summary judgment. Defendants further object to the characterization of the execution of search warrants throughout their statement of facts as "raid" or "raided" because this is not the term police officers use for execution of warrants and is specifically being used by Plaintiffs to inflame emotion and is prejudicial; thus, Defendants move to strike all references to "raid." Subject to and without waiving the objections, Defendants contest this statement in part and do not contest this statement it in part. Defendants do not contest Jolliff-Blake was involved in the execution of a search warrant at 749 South Keeler in 2010 and he recalls heroin and crack being confiscated. Defendants contest that 749 Keeler is on the corner of South Keeler and Fifth Avenue as there are two vacant lots separated by an alley between 749 South Keeler and Fifth Avenue. (Defendants' Ex. 4, Google photo showing the distance between 749 South Keeler and Fifth Avenue).**

24.   On June 19, 2012, one day before the execution of the warrant on the Edwards' home, members of the Chicago Police Department again executed a search warrant on the corner drug house at 749 South Keeler Avenue. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 289-91.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to the characterization of 749 South Keeler as the "corner drug house" because (a) it is not on the corner, and (b) "drug house" is argumentative, speculation and conjecture. (*See* response to # 23 above). Subject to and without waiving these objections, Defendants dispute 749 Keeler is on the corner of South Keeler and Fifth Avenue as there are two vacant lots separated by an alley between 749 South Keeler and Fifth Avenue. (Defendants' Ex. 4, Google photo showing the distance between 749 South Keeler and Fifth Avenue). Defendants do not dispute the CPD executed a search warrant at 749 south Keeler on June 19, 2012.**

<u>No relationship between Frederick Sutton and plaintiffs</u>

25.   Frederick Sutton was acquainted with Nelson Edwards' son more than 30 years ago, in the 1980's, when he was a child but, other than that, he has had no contact with the Edwards family, he might or might not recognize the other family members if he saw them again (the son has moved out of town), and he knows them only by reputation, as an upstanding, law-biding family. *Pls Exhibit 8 (F Sutton Declaration).*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants dispute this statement. Freddy Sutton personally knows Nelson Edwards, Shawna Edwards, Sherri Edwards and Patrick Edwards and spoke to Patrick Edwards in the neighborhood of 827 South Keeler as recently as November, 2012. (Defendants' Ex. 3, Freddy Sutton Declaration).**

26.   Nelson Edwards, Shawna Edwards, Sherri Edwards, and Shawna Walker do not know a man named "Freddy Sutton" and they do not remember ever having met or seen him, and they told defendants that when defendants were searching their home, looking for a "Freddy Sutton." *Doc. 187, Third Am. Complaint ¶ 11 (No Answer1); Pls Exhibits 11, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Reed, and Sullins) at # 61; Jt Exhibit C (N Edwards Dep Tr) at 22;  Jt Exhibit D (Sherri Edwards Dep Tr) at 46.*

**RESPONSE**:  **Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants dispute this statement. (Defendants' Ex. 3, Freddy Sutton Declaration).**

<u>Circumstances of meeting Jolliff-Blake, Herrera, and Cantore</u>

27.   Early in the morning of June 16, 2012, the "John Doe" witness was "as sick as a dog" and needed dope, so he bought and used heroin from a man named "Fred," and then, being "dope sick" again and desperate, he went downtown to make money panhandling and returned to the neighborhood for more heroin. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 29-37; Jt Exhibit S-5 ("John Doe" Dep Tr III- under seal) at 161, 164.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving**

this objection, Defendants do not dispute this statement in part and dispute the assertion in part. Defendants do not dispute that J. Doe was dope sick the early in the morning when he went to 827 Keeler to buy heroin. Defendants dispute the remaining assertions. Officer Blake testified to different factual circumstances surrounding meeting with J. Doe on June 16, 2012. Blake had known the J. Doe for a while, *probably months*, prior to June 20, 2012 and that the first time they met J. Doe was walking along the sidewalk, and Blake stopped his car and J. Doe came over and talked to him. (Joint Ex. G-1, 91-92, Joint Ex. G-5, 326:9-14, 334:1-6). Blake further testified that J. Doe was asked to come into the 11th district station on June 16, 2012 and he took the train and walked, and was not put into the vehicle for being suspicious on June 16, 2012. (Joint Ex. G-1, 116:1-15). It is unambiguous from the context of the J. Doe's testimony that he was confused by the questions and the dates, and lacked specific memory of the some of the events as it had been three years.

28.   "Fred" usually sold heroin at the Daniel Webster School, a school around the corner from Fred's house, located near South Pulaski Road and West Arthington Street, the picture of which the "John Doe" witness identified at deposition. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 26; Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 142-46; Pls Exhibit 6 (Picture of Daniel Webster School).*

**RESPONSE:  Defendants do not dispute Fred usually sold heroin at the Daniel Webster School. Defendants object to the remaining assertions of fact in this statement as misleading, incomplete and mischaracterization of the record. Specifically, Plaintiffs' dubious reference to "Fred's house" – without identifying a location address was meant to distort the record. Plaintiffs' are well aware that throughout J. Doe's deposition testimony, he referred to "Fred's house" - not as Fred's actual residence at 3938 Lexington, but as the location on the corner of Arthington and a "K" Street with the dog**

cages in the backyard and where he bought heroin from Sutton on June 16, 2012. (Joint Ex. S-1, 26-28; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20).

When shown a picture of 3938 West Lexington (Fred's actual residence), J. Doe stated unequivocally that "[t]his is not the house I bought heroin from," and does not know who lives in that house. (Joint Ex. S-3, 90-92). Defendants also deny that the Daniel Webster School is located on Arthington and Pulaski. The school is located on Arthington and Karlov, a block west of Pulaski and just two blocks from the corner of Arthington and Keeler (827 South Keeler). (Joint Ex. S-5, 144:18-24, 144:1-12, 146:1-16; Defendants' Ex. 5, Google Map of location of Daniel Webster School).

29.   On that date (June 16, 2012), it was different from other times he had bought heroin from the man named "Fred," in that it was so early (5:30, or 6:00 AM) that the "John Doe" witness and "Jimmy" had to go to Fred's house; that was the only time the "John Doe" witness had ever been in the house. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 23, 28-32; Jt Exhibit S-5 ("John Doe" Dep Tr III- under seal) at 165.*

RESPONSE:  Defendants' object to the reference to "Fred's house" because the location of "Fred's house" is not identified. J. Doe's deposition testimony identifies "Fred's house" as being located on the corner of Arthington and a "K" Street with the dog cages in the backyard (827 Keeler), where he bought the heroin – not 3938 Lexington as Plaintiff purports in her Memorandum. (Joint Ex. S-1, 26-28; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20). Subject to and without waiving this objection, Defendants do not dispute J. Doe bought heroin from a man named "Fred" on June 16, 2012, early in the morning, from a house located on the corner of Arthington and a "K" Street with the dog cages in the backyard (827 Keeler) - not on Lexington, but near the school (Daniel

**Webster School from # 28). When asked if Fred's house was on Lexington, J. Doe answered: "No. Lexington – no, because Lexington runs like this. So there's no way it could've been Lexington. It would have to be Karlov or Keeler or it would have to be a "K" street. Cause all the K streets run like this. So. No. It - there's no way. There is no way." J. Doe also pointed out in his deposition that the house where he bought the heroin (Fred's house) was on Arthington and a K Street. (*See* Joint Ex. S-1, 26-30, Joint Ex. S-5, 147:9-19).**

30.   According to the "John Doe" witness, Fred's house, which he told Jolliff-Blake about, was on South Flournoy Street in Chicago, Illinois, and "If you needed dope, everybody would say go down - - go down to Flournoy;" at one point in his testimony, he also thought the house might have been on South Karlov Street. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 17-18, 22, 28-29, 33.*

**RESPONSE:  Defendants dispute this fact as it takes J. Doe's deposition testimony out of context, and deliberate distortion and mischaracterization of the record. J. Doe never testified that he *told Jolliff-Blake* Fred's house was on Flournoy. Early in his deposition, J. Doe had trouble recalling the exact address of the house where he went to buy the drugs. He mentions "the house over up on Flournoy," but says "I don't know the address. All I could do is take you there and show you the house."  (Joint Ex. S-1, 17-20). Shortly after, as the deposition continues and J. Doe's memory is refreshed from the discussion about June 16, 2012, he starts to recall the names of streets and testifies unequivocally and repeatedly throughout all three depositions that the house where he bought the drugs (Fred's house) was the house on the corner with the dog cages, on Arthington and a K Street. (Joint Ex. S-1, 26-30; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20; s*ee also* Joint Ex. G-1, 117:23-24, 118:1-4).**

31.    On June 16, 2012, the "John Doe" witness was walking two-to-three blocks from where he was going to buy heroin again, when he saw a police vehicle, an unmarked black Tahoe, and he knew he was "screwed." *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 160-62, 164-65.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants dispute this statement. Officer Blake testified to different factual circumstances surrounding meeting with J. Doe on June 16, 2012. Blake had known the J. Doe for a while, *probably months*, prior to June 20, 2012 and that the first time they met J. Doe was walking along the sidewalk, and Blake stopped his car and J. Doe came over and talked to him. (Joint Ex. G-1, 91-92, Joint Ex. G-5, 326:9-14, 334:1-6). Blake further testified that J. Doe was asked to come into the 11th district station on June 16, 2012 and he took the train and walked, and was not put into the vehicle for being suspicious on June 16, 2012. (Joint Ex. G-1, 116:1-15). It is unambiguous from the context of the J. Doe's testimony that he was confused by the questions and the dates, and lacked specific memory of the some of the events as it had been three years.**

32.    The "John Doe" witness acknowledged that he was "being suspicious," by spinning around and trying to go the other way when he saw the police vehicle. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 126-27.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment, and offered to mislead the Court into believing the event referred in this statement occurred on June 16, 2012 (See Plaintiff's Memo at p.10, ¶ 2). Subject to and without waiving the objection, Defendants do not dispute the J. Doe testified as quoted; however, state the J. Doe was testifying about when he had first met Officer Blake and referring to how long he had known Fred before meeting Officer Blake. There is no link in the J. Doe's testimony to this event on June 16,**

2012. At the time this statement was made in J. Doe's deposition, Plaintiffs' counsel did not even know what year J. Doe was referring to: "I'm trying to figure out what year we are in?" Responding further, J. Doe does not recall how long he knew Fred before meeting Officer Blake or how long it was between first meeting Officer Blake and the time he signed the Complaint for Search Warrant. (Joint Ex. S-5, 126-128). Moreover, Officer Blake testified to different factual circumstances surrounding meeting the J. Doe for both the first time and on June 16, 2012. Blake had known the J. Doe for a while, *probably months*, prior to June 20, 2012 and that the first time they met J. Doe was walking along the sidewalk, and Blake stopped his car and J. Doe came over and talked to him. (Joint Ex. G-1, 91-92, Joint Ex. G-5, 326:9-14, 334:1-6). Blake further testified that J. Doe was asked to come into the 11th district station on June 16, 2012 and he took the train and walked, and was not put into the vehicle for being suspicious on June 16, 2012. (Joint Ex. G-1, 116:1-15). It is unambiguous from the context of the J. Doe testimony that he was confused by the questions and the dates, and lacked specific memory of the some of the events as it had been three years. Defendants encourage the Court to read (or view videos of) the transcripts in entirety.

33. As a white man, the "John Doe" witness stuck out like a "highlighter" in a neighborhood where no white people live. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 157-58, 160*.

RESPONSE: Defendants object to this fact as speculation and conjecture and irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants deny this fact to the extent it purports to apply in the context of the events of June 16, 2012, which Plaintiff attempts to do (See Plaintiffs' Statement # 31). Officer Blake testified to different factual circumstances

surrounding meeting the J. Doe for both the first time and on June 16, 2012. (*See* response to # 32 above).

34.    Defendants Michael Jolliff-Blake, Antonio Herrera, and a third officer, all of whom the "John Doe" witness had never met before, were in the Tahoe and they stopped him, searched him (taking away his hypodermic syringes), and put him into the police vehicle. *Jt Exhibit S-5 ("John Doe" Dep Tr III- under seal) at 126-31, 164.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Furthermore, it is a distortion and mischaracterization of the complete record to the extent it purports to apply in the context of the events of June 16, 2012, which Plaintiff attempts to do (See Plaintiffs' Statement #31). Subject to and without waiving the objection, Defendants dispute this fact. Officer Blake testified to different factual circumstances surrounding meeting the J. Doe for both the first time and on June 16, 2012. Officer Blake had known the J. Doe for a while, *probably months*, prior to June 20, 2012 and that the first time they met J. Doe was walking along the sidewalk, and Blake stopped his car and J. Doe came over and talked to him. (Joint Ex. G-1, 91-92, Joint Ex. G-5, 326:9-14, 334:1-6). Blake further testified that J. Doe was asked to come into the 11th district station on June 16, 2012 and he took the train and walked, and was not put into the vehicle for being suspicious on June 16, 2012. (Joint Ex. G-1, 116:1-15). It is unambiguous from the context of the J. Doe testimony that he was confused by the questions and the dates, and lacked specific memory of the some of the events as it had been three years. Defendants counsel objected to the questioning as it was clear Plaintiffs' counsel and the witness were discussing different dates. (Joint Ex. S-5, 161-162). At one point, Plaintiffs' counsel did not even know what year J. Doe was referring to: "I'm trying to figure out what year we are in?" (Joint Ex. S-5, 126-128). Defendants encourage the Court to read (or view videos of) the transcripts in entirety.**

35.    Michael Jolliff-Blake, Antonio Herrera, and Michael Cantore were all partners on June 16, and June 20, 2012, working Beat 1162D.  *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 88.*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants do not dispute this fact in part and dispute it in part. Defendants admit Michael Jolliff-Blake, Antonio Herrera, and Michael Cantore were all working beat 1162D on June 16 and June 20, 2016 and on the same Tactical Team. Defendants deny they were all "partners" on both dates as nothing in record cited reflects that statement. (Joint Ex. G-1, 87-89).**

36.    "John Doe" witness was "dope sick" at the time he was taken into police custody, and, in the "John Doe" witness's words: "All I know is they screwed me up because I reallywanted some dope then." *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 160.*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Furthermore, it is a distortion and mischaracterization of the complete record to the extent it purports to apply in the context of the events of June 16, 2012, which Plaintiff attempts to do (See Plaintiffs' Statement # 31). Subject to and without waiving this objection, Defendants deny this fact. Officer Blake testified that J. Doe was asked to come into the 11th district station on June 16, 2012 and that he met with him there. J. Doe took the train and walked to the 11th District, and was not taken into police custody on June 16, 2012. (Joint Ex. G-1, 86-87, 116:1-15).**

37.    Jolliff-Blake, Herrera, and the third officer drove the "John Doe" witness to the station at Harrison and Kedzie, where Jolliff-Blake asked him to help them out by giving up a drug house, and since the only house he had been in to buy drugs was the one he had visited that morning, he told Jolliff-Blake about that house. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 129, 131.*

**RESPONSE: Defendants deny this fact. The statement is a distortion and**

**mischaracterization of the record. On June 16, 2016, J. Doe arrived by train and walked to the police station at Harrison and Kedzie and was not escorted by police. (Joint Ex. G-1, 86-87, 116:1-15; Joint Ex. M-1, 92:8-23, 93:8-15). While at the police station meeting with Officer Blake, J. Doe was asked by Officer Blake if he had been in any houses to buy drugs. J. Doe said yes and told Blake where the house was located, and told him about the dog pens in the backyard, where he and other people he knew were going to buy drugs. (Joint Ex. S-5, 132:11-16; Joint Ex. G-1, 117:5-15, 118:1-6). When asked by Plaintiffs' counsel during his deposition why he decided to tell Officer Blake about Freddy Sutton and no other people he bought drugs from, J. Doe's response was "I was asked if I had been in a house to buy drugs, *in a house*, and that was the only house I was in to buy drugs." (Joint Ex. S-5, 133:23-25, 134:1-3).**

38. The "John Doe" witness did not know what the house where he bought heroin looked like, whether it was made of wood or of brick, and he did not know an address for the house; dog kennels in back were mentioned for the first time in conversation when Jolliff-Blake, Herrera, and the "John Doe" witness drove past the house and Jolliff-Blake asked the witness if there were any dogs on the property. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 134; Jt Exhibit M-1 (Herrera Dep Tr I) at 106-07, 166-67.*

**RESPONSE:  Defendants dispute this fact. At the time of his deposition, three years after the search warrant, J. Doe was asked what the house looked like and whether it was made of wood or brick. J. Doe could not remember what the house looked like at the time of his deposition, but only remembered the dog cages in the backyard and going through the side gangway to get into the house. (Joint Ex. S-5, 134:18-24). On June 16, 2012, while at the 11th District station, J. Doe knew where the house was located and told Blake where the house was located, described it and told him about the dog pens, and that is was on Arthington and Keeler and on the corner. (Joint Ex. S-5, 132:11-22; Joint Ex. G-1, 117:5-15, 118:1-6, 159:6-23, 160:13-17; Joint Ex. M-1, 102:1-6). Plaintiffs' statement**

that dog Kennels were mentioned for the "first time" when they drove the witness past the house is an outrageous distortion and misrepresentation of the record. Plaintiffs cite the deposition of Officer Herrera to support this fact. However, Officer Herrera states clearly that he does not recall if he had a conversation with J. Doe about the dog kennels, and further states that he does not recall if he had a conversation with Blake or the informant about the dog kennels, and is not sure if Blake asked if there were dogs on the premises. (Joint Ex. M-1, 102:1-6, 166-67). J Doe told Officer Blake about the dog cages while at the police station. (Joint Ex. S-5, 132:11-22).

39.    Jolliff-Blake and Herrera did not pay the "John Doe" witness for his information and they did not tell him he could get paid for information in the future; they also did not charge him with any crimes that day, June 16, 2012. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 129, 131, 139-40.*

**RESPONSE:  Defendants do not dispute this fact.**

<u>Reliability or unreliability of informant and his information</u>

40.    The "John Doe" witness met Jolliff-Blake for the first time on June 16, 2012, and he had never given any information to the police leading to an arrest or a search warrant before June 16, 2012, and never gave any information to the police leading to an arrest or a search warrant after June 16, 2012. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 127, 136-37; Exhibit G-5 (Jolliff-Blake Dep Tr III) at 336; Pls Exhibits 12, 16, 20, 24, 28, 32, 36, 40, 49, 54 (Ans to N Edwards' Interrogatories by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Reed, and Sullins) at # 17, 18.*

**RESPONSE:  Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving this objection, Defendants dispute these facts. Officer Blake knew the J. Doe for months prior to June 16, 2102. (Joint Ex. G-1, 91-92, Joint Ex. G-5, 326:9-14, 334:1-6; *see also* response to # 34). Officer Blake testified that he did not recall any information that J. Doe gave him that led to a search warrant or an arrest prior to June 16, 2012. Blake was not answering for the entire Chicago Police Department. (Joint Ex. G-5, 336:15-20). Further,**

all the officers stated in their answers to the interrogatories cited above (*i.e.* Ans to N Edwards' Interrogatories by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Reed, and Sullins) at # 17, 18) that "to the best of their knowledge, none." Moreover, J. Doe testified that there was at least one other occasion that he was an informant for the Chicago Police for a search warrant and went in front of a judge and that someone was arrested. (Joint Ex. S-5, 137-139, 182-183).

41.     Over objection of plaintiffs, the Court accepted the stipulation of defendants that they would not adduce evidence that the informant in this case ultimately became a registered informant or solicit any information about subsequent transactions or information he may or may not have provided to law enforcement, in order to bolster his credibility. *Doc. 197 (Order of 5/22/15)*; *Doc. 216 (Tr of Ct Prdgs of 5/12/15) at 8-9, 17.*

**RESPONSE:  Defendants move to strike this statement because it is not appropriate for a statement of undisputed facts for summary judgment as it not a fact related to the underlying issues in this case and is completely irrelevant and immaterial to the determination of summary judgment. Further, Defendants object and move to strike Plaintiffs' conjecture suggesting "in order to bolster his credibility." Subject to and without waiving the objection, Defendants admit only that they have stipulated to not using any information about the informant's status *post* June 17, 2012 (the day the warrant was issued) at trial as it is completely irrelevant to the claims or issues in this case. Defendants deny the remaining facts.**

42.     The complaint in support of the search warrant does not state any reasons why the "John Doe" witness was reliable, yet defendants stated in their answers to interrogatories that the basis for reliability was in the complaint. *Jt Exhibit B (Complaint for Search Warrant); Pls Exhibits 12, 16, 20, 24, 28, 32, 36, 40, 49, 54 (Ans to N Edwards' Interrogatories by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Reed, and Sullins) at # 22[3] .*

**RESPONSE:  Defendants object to this fact as argumentative and conclusory. Subject to and without waiving the objection, Defendants dispute this fact. The**

Complaint for Search Warrant states reliability, *inter alia*, in the detailed account of illegal conduct based on J. Doe's personal observations. The level of detail here includes when, where and from whom the J. Doe purchased heroin; a step-by-step description of the illegal transaction, the exact quantity and price paid for the heroin, and the J. Doe's assessment of the quality of the heroin. Further crediting the reliability of the information, J. Doe attests, against his penal interest, to having purchased heroin, and to personally ingesting the heroin following the transaction. Further the Complaint for Search Warrant states Officer Blake's corroboration of J. Doe's information. Blake identified "Fred" as Freddy Sutton by having J. Doe identify him through a photograph obtained from the CPD's IClear database. J. Doe confirmed 827 Keeler was the location where he purchased the heroin through a photo of the residence Blake obtained from the County Assessor's website, and by J. Doe pointing directly to 827 Keeler during a drive-by with Officer Blake. Additionally, Freddy Sutton's criminal history showed he had had been arrested numerous times for drug offenses within the area of 827 Keeler. Blake presented the Warrant Application, J. Doe and his criminal history to a Judge, who following an examination of J. Doe under oath, found probable cause to approve the warrant. (Joint Ex. B).

43.    When Jolliff-Blake and Herrera spoke with the "John Doe" witness at the police station on June 16, 2012, he was very obviously under the influence of drugs, in that his pupils were constricted, he said he had been up all night getting high, he was shaky and jittery, and he was continuously moving back and forth. *Jt Exhibit M-1 (Herrera Dep Tr I) at 93-95.*

  **RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants deny this fact. On June 16, 2012, Officer Blake could not tell whether J. Doe was on narcotics or not. (Joint Ex. G-1, 130:5-14). Herrera was not part of the conversation**

between Blake and J. Doe at the police station, but was in the same room and within earshot and did not hear everything that was said. **(Joint Ex. G-1, 130:22-24; Joint Ex. M-1:13-19).**

44.    According to Herrera, the "John Doe" witness told Jolliff-Blake and Herrera that the night before and the morning of June 16, 2012, he had been getting high all night in the basement of a building that was used as a drug house, whose address he did not know, and that he had slept for a few hours in that basement.  *Jt Exhibit M-1 (Herrera Dep Tr I) at 94-97.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to the wording "according to Herrera" as argumentative, and not appropriate as an undisputed fact for summary judgment since it clearly infers that other witnesses have different testimony making it a disputed fact. Subject to and without waiving the objection, Defendants dispute this fact. J. Doe knew the location of the house, on June 16, 2012, and told Officer Blake the house was on the corner of Arthington and Keeler, and did not mention anything about a party, sleeping, or getting high all night, but he left and went somewhere and ingested the heroin. (Joint Ex. S-5, 132:11-22, 169:6-13; Joint Ex. G-1, 117:5-15, 118:1-6, 130:20-21, 137:12-19, 138:22-24, 159:6-23, 160:13-17; Joint Ex. M-1, 102:1-6). J. Doe did not say he slept for a few hours in that basement. (Joint Ex. G-5, 359:12-17).**

45.    Jolliff-Blake claimed not to know that police records showed that the "John Doe" witness had tried to harm himself while in police custody in February 2012 and, although Jolliff- Blake has a master's degree in psychology from Adler School of Psychology, he claimed not to have an opinion about the "John Doe" witness's mental stability when speaking to him on June 16, 2012.  *Exhibit G-1 (Jolliff-Blake Dep Tr I) at 29; Exhibit G-5 (Jolliff-Blake Dep Tr III) at 363-64.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to the wording "claimed not to know" and reference to Officer Blake's degree in psychology and move to strike**

both phrases as argumentative, speculation, conclusory and inappropriate for a statement of fact as it is asking the Court to make a credibility determination. **Subject to and without waiving the objection, Defendants do not dispute that on June 16, 2012, Officer Blake did not know whether or not J. Doe had tried to harm himself while in police custody in February of 2012, and that he does not have an opinion about J. Doe's mental stability on June 16, 2012.**

46.   Although Jolliff-Blake said that the "John Doe" witness was knowledgeable about drug sales, Jolliff-Blake could not remember any information about locations or addresses of any drug sales, or the names of any individuals involved in the drug sales, that the "John Doe" witness mentioned that was credible, other than, in general, the intersection of "Lake and Pulaski," an intersection that is widely known as a drug sale location without the assistance of the "John Doe" witness.  *Exhibit G-5 (Jolliff-Blake Dep Tr III) at 336-38, 358.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Further, Defendants object on the basis that it is argumentative and because Officer's Blake's lack of memory of specific addresses or locations discussed with J. Doe three years after the fact is irrelevant and asking the Court to make a credibility determination based on Blake's memory. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute it in part. Defendants do not dispute (1) that prior to June 2012, J. Doe had given Officer Blake information that he independently corroborated as being truthful; (2) the J. Doe was knowledgeable and had given him information relating to the sale of narcotics around the 11th District and was exact in his descriptions of individuals, but he could not remember their names three years after the fact; and (3) Blake recalled "Lake and Pulaski" as one location, stating further he recalled a house on "Gladys" street and the J. Doe also gave information to Blake that supported and reaffirmed other narcotic spots in the area. (Joint Ex. G-1, 165-168: Joint Ex. G-5, 336:21-25, 337-339, 358). Defendants**

deny the remaining facts.

47.    Jolliff-Blake and Herrera knew that the "John Doe" witness was homeless, and was a panhandler, and they also could see from his criminal record and police contact cards that he had been charged with crimes of dishonesty, having stolen another person's identity and having committed bank fraud to obtain cash, and that he also had been stopped and arrested for exhibiting erratic behavior, such as aggressively assaulting people while panhandling, *Pls Exhibit 1("John Doe" criminal history); Jt Exhibit G-5 (Jolliff-Blake Dep Tr III) at 360-63.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object that there is no time frame associated with this fact, which makes it misleading. Subject to and without waiving the objection, Defendants do not dispute this fact in part, and dispute it in part. Defendants dispute J. Doe was arrested for the crime "dishonesty." (Pls. Exhibit 1, J. Doe Criminal History). Defendants dispute Blake and Herrera "knew" J. Doe was homeless on June 16, 2012 as nothing in the cited or elsewhere in the record of this case supports this statement. Defendants dispute that Blake and Herrera knew J. Doe had been stopped for aggressive assaulting or erratic behavior. (Joint Ex. G-5, 360:3-10, 361:6-10). Defendants do not dispute J. Doe's criminal record showed that J. Doe was arrested and confessed to "Identity Theft" under Illinois Statute 720-5/16G-15(a)(1). (Pls. Exhibit 1, J. Doe Criminal History). Defendants do not dispute Blake and Herrera were aware J. Doe panhandled.**

<u>Switch in identity of the "John Doe" witness[2]</u>

48.    For some unexplained reason, Jolliff-Blake says that when he read Herrera's deposition transcript before his own deposition, he realized that he (Jolliff-Blake) had been

---

[2] This heading is plainly argumentative and inappropriate.  Blake did not switch the J. Doe's identity. He merely made a mistake in 4 answers to Requests to Admit, which the Court permitted him to amend without prejudice. Further, the Court granted that motion subsequent to Blake's deposition testimony cited above, and at a time prior to the disclosure of the J. Doe's identity. As a result, Blake could not answer Plaintiffs' counsel's questions with any clarity without providing information that would identify the J. Doe witness in this case. Notably, the Court permitted a subsequent deposition of Blake after disclosure of the J. Doe; however, Plaintiffs' counsel never followed up further on this subject.

"confused" when he responded to plaintiffs' requests to admit and when he attended other officers' depositions (Cantore, Skipper, Reed, Beluso) as to who the "John Doe" witness really was, because he had three informants who looked the same (white, in their 20's, light hair, average built), and that he now believes the "John Doe" witness to be someone different, someone he had in fact been in continuous contact with and was trying to work with as a Registered Cooperating Individual. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 179-93; Jt Exhibit G-2 (Video of Jolliff-Blake Dep Tr I) at 3:57 - 4:22.*

**RESPONSE: Defendants object to this assertion of fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to the wording "for some unexplained reason" as argumentative, speculation, conclusory, inappropriate and asking the Court to make a credibility determination and, therefore, move to strike. Subject to and without waiving this objection, Defendants do not dispute that at the time Blake answered Plaintiffs' request to admit, he had been working with three informants in the 11th district who looked the same and in giving his answer to 4 requests, he had mistakenly identified one of the three informants as the J. Doe used for the 827 Keeler warrant. Defendants do not dispute after reading Herrera's deposition transcript before his own deposition, and his aforesaid answers to the requests to admit, he recognized he had made a mistake in his answers as described to the Court in his Motion for Leave to Amend his Answers to Request to Admit, which the Court granted (Doc. 104). Defendants dispute Blake was "confused" when he attended other officers' depositions as to who the "John Doe" witness really was and that he had continuous contact with and was trying to work with as a Registered Cooperating Individual as neither statements are supported by the record cited. (Joint Ex. G-1, 179-93)**

49. Jolliff-Blake testified that Herrera was "misinformed" as to who the "John Doe" witness was, and was "confused," but had no idea as to how and why Herrera became misinformed and in what way he was confused. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 176-77, 183.*

**RESPONSE: Defendants admit this fact. Responding further, the J. Doe in this**

case was not Herrera's informant and Herrera did not prepare the affidavit in support of the search warrant.

50.    Jolliff-Blake was confused as to why he was confused about the identity of the "John Doe" witness and he was not sure when his confusion ended, although it was after plaintiffs moved to compel defendants to identify the informant on May 23, 2014, and the extended briefing of the motion, and before the Court ruled on the motion on November 22, 2014, requiring the disclosure of the informant. *Jt Exhibit G-3 (Jolliff-Blake Dep Tr II) at 277-81; Jt Exhibit G-4 (Video of Jolliff-Blake Dep Tr II) at 0:28 - 0:37; Doc. 72 (Pls Motion to Compel Disclosure); Doc. 149 (Court Order Compelling Disclosure).*

   **RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants also object to the Plaintiffs' characterization of Blake being "confused as to why he was confused" as vague, argumentative, and Plaintiffs' opinion and conjecture. Subject to and without waiving the objection, Defendants dispute this fact as characterized. (See response to #48 above).**

51.    Jolliff-Blake kept notes about the "John Doe" witness but does not know what happened to those notes and it is not his practice to keep a file on informants. *Jt Exhibit G-1 (Jolliff-Blake's Dep Tr I) at 188-90, 194.*

   **RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants do not dipsute this fact.**

52.    Jolliff-Blake moved the Court for leave to change his answers to plaintiffs' requests to admit, from denying that he knew the "John Doe" witness's name to admitting that he knew his name, and from saying that he had not registered the witness to saying that he had registered the witness. *Doc. 104 (M to Amend Answers to Requests to Admit); Pls Exhibit 11 (Judicial Admission to Req. to Admit by Jolliff-Blake) at # 25, 32*

   **RESPONSE:  Defendants object to this fact statement because it is not appropriate for a statement of undisputed facts for summary judgment as it not a fact related to the underlying issues in this case and completely irrelevant and immaterial to the determination of summary judgment and inappropriate for a statement of undisputed**

facts. **Subject to and without waiving the objection, Defendants admit that Blake moved the Court to change four answers to his requests to admit because he had made an error and that motion was granted.**

### Information given by "John Doe" witness about "Fred"

53.   The "John Doe" witness said he bought drugs from "Fred," but did not know his last name. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 166; Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 117, 129.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants admit this fact.**

54.   Jolliff-Blake testified that in order to establish probable cause for the search warrant, he queried a police database for men with the name "Fred" in Beat 1132 and surrounding beats, constructed a photographic array of six men out of the approximately ten men named "Fred" in that area, showed the array to the "John Doe" witness, and then destroyed the array after he told the "John Doe" witness to pick out the target and the "John Doe" witness picked out a man named Frederick Sutton. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 142-51; Exhibit G-3 (Jolliff-Blake Dep Tr II) at 264-65.*

**RESPONSE:  Defendants object to this fact as characterized because "photographic array" is not defined, and "approximately ten men" is vague and a distortion of the record. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute it in part. Defendants admit that Officer Blake used a police database (IClear as specified on the Complaint for Search Warrant) to query "Freds" in the area around 827 South Keeler and that he constructed a photographic display of six men that he showed to J. Doe who picked out Freddy Sutton as the Fred who sold him the heroin. Defendants deny that Blake came up with approximately ten "Freds" in the area and that he destroyed the photographic array because it misrepresents the record.  Blake testified that he has no idea where the so-called array is now, and that he**

29

did not keep it. He never said he "destroyed" it. (Joint Ex. G-1, 147:1-6). Blake also

testified he did not recall how many "Freds' resulted from him query of the database and

when pressed to narrow it down, he said ten is "seemingly close" to the number. (Joint Ex.

G-1, 145:1-9).

55.    Jolliff-Blake and Herrera had never heard of or encountered Frederick Sutton
prior to talking to the "John Doe" witness on June 16, 2012, and did not verify or know of
any connection between Frederick Sutton and the Edwards home at 827 South Keeler
Avenue. *Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 15-16, 70-71, 75-76;  Jt Exhibit G-5
(Jolliff-Blake Dep Tr III) at 349;  Jt Exhibit M-1 (Herrera Dep Tr I) at 32.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the**

**determination of summary judgment. Subject to and without waiving the objection,**

**Defendants admit this fact in part and deny it in part. Defendants admit that Blake and**

**Herrera had never encountered Freddy Sutton prior to June 16, 2012. Defendants deny**

**that Blake and Herrera did not know of any connection between "Fred" and the**

**Edwards home prior to June 16, 2012. Officer Blake testified that J. Doe had told him**

**about the house where he was buying heroin (Arthington and Keeler) and described the**

**individual about two weeks before June 16, 2012. (Joint Ex. G-1, 117:2-25, 118:1-6,**

**126:5-10).**

56.    The complaint in support of the search warrant does not state how defendant
Jolliff- Blake made a determination that "Fred" was Frederick Sutton, and there is no mention
in the complaint of the photographic array, and how it was conducted. *Jt Exhibit B (Complaint
for Search Warrant); Jt Exhibit G-3 (Jolliff-Blake Dep Tr II) at 266-67.*

**RESPONSE:  Defendants dispute this fact. The Complaint for Search Warrant**

**states how Officer Blake determined Freddy Sutton: "utilizing the CPD IClear database**

**located a photograph of one Freddy Sutton, with IR #843014. J. Doe identified the**

**photograph as Fred, the individual who sold J. Doe the above mentioned heroin On June**

**16, 2012 at 827 South Keeler." Further, the Complaint for Search Warrant provides a**

detailed description of "Fred" that was provided by J. Doe "as a, male, black, 6'02", 215 lbs., black hair, brown eyes . . . ." (Joint Ex. B).

<u>Information given by "John Doe" witness about the house</u>

57. The "John Doe" witness did not know the address of the house he had been to earlier on June 16, 2012, but thought it was on Flournoy, although Jolliff-Blake's "impression of the discussion" on June 16, 2012, was that the "John Doe" witness thought that the house was in the area of Arthington and Keeler, with the "John Doe" witness first thinking it was "near" a corner and then thinking that it was "at" a corner, although he did not know which corner. *Jt Exhibit S-1 ("John Doe" Dep Tr I - under seal) at 17-18, 22, 28-29, 33; Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 126, 160-62.*

**RESPONSE: Defendants object to the quotation of "impression of the discussion" because it is taken out of context and a distortion of the record. Subject to and without waiving the objection, Defendants deny this fact. This is a deliberate distortion and mischaracterization of the record. J. Doe never testified that he *told Jolliff-Blake* he thought Fred's house was on Flournoy. Early in his deposition, (three years after the fact) J. Doe, at first, had trouble recalling the exact address of the house where he went to buy the drugs. He mentions "the house over up on Flournoy," but says "I don't know the address. All I could do is take you there and show you the house." (Joint Ex. S-1, 17-20). Shortly after, as the deposition continues and J. Doe's memory is refreshed from the discussion about June 16, 2012, he starts to recall the names of streets and testifies unequivocally and repeatedly throughout all three depositions that the house where he bought the drugs (Fred's house) was the house on the corner with the dog cages, on Arthington and a K Street. (Joint Ex. S-1, 26-30; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20; s*ee also* Joint Ex. G-1, 117:23-24, 118:1-4). J. Doe testified repeatedly that he bought heroin from Freddy Sutton at the house on the corner of Arthington and a K**

Street (827 Keeler) - - the only house with dog pens and on the corner in the neighborhood. "It would have to be Karlov or Keeler or it would have to be a K street. . . ." (*See* Joint Ex. S-1, 25:16-24, 26:13-25, 27:1-6, 27:16-18, 28:1-10, 31:6-15, 32:6-19; Joint Ex. S-3, 88-89; Joint Ex. S-5, 132:11-22, 134:1-9, 134:10-25, 143:1-6, 147:12-25, 149:7-18, 149:21-25, 150:1-14, 153:2-25, 154:3-20). In context, Blake did not testify that his 'impression of the discussion" on June 16, 2012 was that the J. Doe thought house was in the area of Arlington and Keeler. J. Doe expressly told Blake "what the building was, where it was at," on the corner of Arthington and Keeler. (Joint Ex. G-1, 161-162). J. Doe knew the street names and described the building as a two story building with a fence around it. (Joint Ex. G-1, 159:6-23).

58.     Jolliff-Blake and Herrera were aware of the distance between 827 South Keeler Avenue and 3938 West Lexington Street, but never asked the "John Doe" witness if he knew that Frederick Sutton's address was 3938 West Lexington Street, not 827 South Keeler Avenue. *Pls Exhibit G-1 (Jolliff-Blake Dep Tr I) at 157-59; Pls Exhibit 9 (Google Map of Area).*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants admit this fact in part and deny it in part. Defendants admit Officer Blake knows and knew where 3938 West Lexington is located. Defendants deny that Blake did not ask the J. Doe if he knew that Freddy Sutton's address was 3938 West Lexington as Blake testified that he does not recall if he brought that to J. Doe's attention or not. (Joint Ex. G-1, 157:5-15, 158:1-6). Regarding Herrera, Plaintiffs point to nothing in the record about his knowledge of 3938 West Lexington or any conversation he had with J. Doe.**

59.   It was Jolliff-Blake who decided that the house the "John Doe" witness was referring to was 827 South Keeler Avenue, by going to the Cook County Assessor's office

and pulling up a single photo, that of 827 South Keeler, without also showing the "John Doe" witness a picture of the drug house on the other corner one block north, at 749 South Keeler Avenue, that Jolliff-Blake had raided in the past, or a picture of Frederick Sutton's home at 3938 West Lexington. *Exhibit G-1 (Jolliff-Blake Dep Tr I) at 161-64.*

**RESPONSE: Defendants object to this fact as argumentative and conclusory. Subject to and without waiving the objection, Defendants deny this fact. Officer Blake never testified that he decided that the house was 827 South Keeler. J. Doe expressly told Blake "what the building was, where it was at," on the corner of Arthington and Keeler. (Joint Ex. G-1, 161-162). J. Doe knew the street corners and described the building as a two story building with a fence around it. (Joint Ex. G-1, 159:6-23; *see also* response to # 57 and 58 above). Defendants further deny that 749 Keeler is on the corner of South Keeler and Fifth Avenue as there are two vacant lots separated by an alley between 749 South Keeler and Fifth Avenue. (Defendants' Ex. 4, Google photo showing the distance between 749 South Keeler and Fifth Avenue).**

60.  Jolliff-Blake did nothing to check who actually owned or lived at 827 South Keeler Avenue, even though he could have gone onto police computers and used the Accurint program or checked the records of the Cook County Assessor, the Recorder of Deeds, or the Secretary of State. *Exhibit G-1 (Jolliff-Blake Dep Tr I) at 62-70.*

**RESPONSE:  Defendants object to this fact as both irrelevant and immaterial to the determination of summary judgment and speculation. Defendants further object to the phrase "did nothing" as argumentative, conjecture and conclusory. Subject to and without waiving the objection, Defendants deny this fact. This is a mischaracterization of the record as Officer Blake testified that he does not recall if he did anything prior to obtaining the warrant to determine who owned the home at 827 South Keeler. (Joint Ex. G-1, 63:7-10).**

<u>No corroboration of criminal activity</u>

61.   Defendants have made judicial admissions that Jolliff-Blake and Herrera did nothing to corroborate any criminal activity at the Edwards' home at 827 South Keeler Avenue and never saw, or heard of, or knew of any criminal activity at 827 South Keeler Avenue, other than what they allege the "John Doe" witness told them. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 18, 19, 20, 37, 38*; *Exhibit G-1 (Jolliff-Blake Dep Tr I) at 15.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment.  Defendants further object to the wording "did nothing" to "corroborate" as being vague, undefined, argumentative, and a legal conclusion. Subject to and without waiving the objection, Defendants do not dipsute only that the above officers admitted to request to admit #18, 19, 20, 37, and 38, noting that #19 was over objection.**

62.   Defendant Jolliff-Blake did not do a controlled buy, did not ask the "John Doe" witness to show him the heroin, did not determine that the witness had money to buy heroin, and did not perform a surveillance until *after* the warrant was signed, during which he saw no criminal activity at, or anyone going into or coming out of, the Edwards home. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 23, 24*;  *Exhibit G-1 (Jolliff-Blake Dep Tr) at 168-70, 208.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment.  Defendants further object to the wording "controlled buy," and "surveillance" as being vague, undefined and a legal conclusion. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute it in part. Defendants admit only that Blake did not determine if the J. Doe had money to buy heroin or ask J. Doe to show him the heroin. Defendants deny that Blake did not do surveillance until after the warrant was issued. Blake did do surveillance of the house "later that Saturday" which was the day before the warrant**

was signed, June 16, 2012. (Joint Ex. G-1, 208:6-11).

63. Jolliff-Blake and Herrera merely drove past the Edwards home at 827 South Keeler Avenue with the "John Doe" witness, slowed down in front of the house, and asked the "John Doe" witness to point at the house and tell them if that was the house. *Exhibit G-1 (Jolliff-Blake Dep Tr) at 207.*

**RESPONSE: Defendants object to wording "merely" as speculation and a legal conclusion. Defendants further object as the statement is a distortion of the record. Subject to and without waiving the objection, Defendants deny this fact as characterized. Office Blake did not indicate to J. Doe which house to point at and he drove the J. Doe past the house and slowed down two times and both times J. Doe identified the same house. (Joint Ex. G-1, 207).**

Complaint in support of warrant

64. Defendants made judicial admissions that all grounds for probable cause were in the complaint in support of the search warrant and that they were not relying on any facts outside the complaint for probable cause. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 35; Pls Exhibits 12, 16, 20, 24, 28, 32, 36, 40, 49, 54 (Ans to N Edwards' Interrogatories by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Reed, and Sullins) at # 6, 7[3].*

**RESPONSE: Defendants object to this fact as it cites Interrogatories which are not judicial admissions. Subject to and without waiving the objection, Defendants do not dispute the above officers admitted to request to admit # 35.**

65. The complaint in support of the search warrant does not state how long Jolliff-Blake knew the "John Doe" witness, it states no track record of reliability for the witness, it states no reasons why Jolliff-Blake believed the witness to be reliable, and it states no motive for the witness to give truthful information. *Jt Exhibit B (Complaint for Search Warrant).*

**RESPONSE: Defendants object to this fact as argumentative and conclusory. Subject to and without waiving the objection, Defendants dispute this fact. The Complaint for Search Warrant states reliability, *inter alia*, in the detailed account of**

**illegal conduct based on J. Doe's personal observations. The level of detail here includes when, where and from whom the J. Doe purchased heroin; a step-by-step description of the illegal transaction, the exact quantity and price paid for the heroin, and the J. Doe's assessment of the quality of the heroin. Further crediting the reliability of the information, J. Doe attests, against his penal interest, to having purchased heroin, and to personally ingesting the heroin following the transaction. Further, the Complaint for Search Warrant states Officer Blake's corroboration of J. Doe's information. Blake identified "Fred" as Freddy Sutton by having J. Doe identify him through a photograph obtained from the CPD's IClear database. J. Doe confirmed 827 Keeler was the location where he purchased the heroin through a photo of the residence Blake obtained from the County Assessor's website, and J. Doe's pointing directly to 827 Keeler during a drive-by with Officer Blake. Additionally, Freddy Sutton's criminal history showed he had had been arrested numerous times for drug offenses within the area of 827 Keeler. Blake presented the Warrant Application, J. Doe and his criminal history to a Judge, who following an examination of J. Doe under oath, found probable cause to approve the warrant. (Joint Ex. B).**

66. The complaint in support of the search warrant states no independent corroboration of a connection between Frederick Sutton and the house, no independent corroboration of the "John Doe" witness's visit to the house earlier in the day to buy drugs, his means to buy drugs, or that drugs were actually bought, and no independent corroboration of "Fred conduct[ing] his narcotics operations from the basement of the residence," or of any criminal activity at all taking place at the house. *Jt Exhibit B (Complaint for Search Warrant); Pls Exhibits 12, 16, 20, 24, 28, 32, 36, 40, 49, 54 (Ans to N Edwards' Interrogatories by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Reed, and Sullins) at # 9, 10[3].*

**RESPONSE: Defendants object to this fact as argumentative and conclusory.**

**Subject to and without waiving the objection, Defendants dispute this fact. (Joint Ex. B;**

*see also* answer to #42 and # 65 above).

67.    Although, according to Jolliff-Blake, the "John Doe" witness told Jolliff-Blake that he went to the front door and bought one bag of heroin for $10, for some reason Jolliff-Blake prepared a complaint in support of a search warrant that stated: "J. Doe walked into the yard of the residence to the back door.  J. Doe knocked on the back door and Fred opened the door and invited J. Doe into the residence, into the basement.  J. Doe then asked Fred for 3 bags of 'blow;'" Jolliff-Blake tried unsuccessfully to explain that when he was referring to the front door as the back door, he meant that the "front of the house . . . has no door." *Jt Exhibit B (Complaint for Search Warrant); Exhibit G-1 (Jolliff-Blake Dep Tr I) at 118, 131, 134, 159, 164, 238; Exhibit G-3 (Jolliff-Blake Dep Tr II) at 265-66.*

**RESPONSE:  Defendants object to the wording "according to Blake" as argumentative, and not appropriate as an undisputed fact. Defendants further object to the Plaintiffs' characterization as "tried unsuccessfully to explain" as opinion, and argumentative, not fact. Subject to and without waiving the objection, Defendants dispute this fact. This is a distortion and mischaracterization of the record. Blake testified first that "from what I recall, he bought one bag," but later recalled and clarified that J. Doe bought three bags. (Joint Ex. G-1, 19-24). Blake further explained that there is no door in the front of the house and that the main entrance is the side door and to how J. Doe described entering through a fence and down a gangway to get to the main (what Doe referred to as front) door (which is on the side of the house or would be back door if standing on Arthington because it is a corner house. There is no entrance door on either Arthington or Keeler). (Joint Ex. G-1, 159:19-25, 160:1-9; Joint Ex. G-5, 266:2-4).**

68.    Lt. Neil J. Skipper's approval by signing the search warrant and complaint was his determination that there was probable cause for the search warrant and that an adequate investigation had been done to determine probable cause, and he did not look at any additional documents, did not ask Jolliff-Blake to do anything additional before giving his approval, and did not have any conversation with Jolliff-Blake about the reliability of the "John Doe" witness or his information, because he did not think it was his role to determine whether the informant is reliable. *Doc. 187, Third Am. Complaint ¶ 60, 61, 65 (No Answer[1]);  Jt Exhibit A (Search Warrant); Jt Exhibit B (Complaint for Search Warrant);  Exhibit G-1 (Jolliff-Blake Dep Tr I) at* 215; *Exhibit R (Skipper Dep Tr) at 36-40, 46-49, 56-57.*

**RESPONSE**: **Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants dispute this factual assertion. The above statement is a complete mischaracterization of the record. Both Officer Blake and Lt. Skipper could not recall conversations they had or did not have about this particular search warrant or the J. Doe (three years prior to their depositions). (Joint Ex. G-1, 215; Joint Ex. R, 36-40, 46-49. 56-57).**

<u>Meeting with judge to sign warrant</u>

69.    Judge Gloria Chevere of the Circuit Court of Cook County has no recollection of the circumstances of the signing of warrant 12 SW 6213 for 827 South Keeler Avenue on June 17, 2012, and kept no notes, and she does not recall whether she relied on anything outside the complaint in issuing the warrant.  *Doc. 152-1 (Chevere affidavit).*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. This fact does not prove or disprove anything consequential to the determination of summary judgment as she does not recall. Subject to and without waiving the objection, Defendants admit this fact.**

70.    Jolliff-Blake, Herrera, and the "John Doe" witness met with the judge at a Chicago Transit Authority station, the "John Doe" witness never met alone with the judge, and the judge did not engage in any conversation, other than reading the complaint. *Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 113-15, 176-77.*

**RESPONSE:  Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute this fact in part. Defendants admit only that J. Doe did not meet alone with the Judge as Officer Blake was present. Defendants deny that the meeting took place at a Transit Authority station as Officer Blake testified the meeting took place near the train station, but at a restaurant. (Joint Ex.**

**G-1, 218:14-20). Defendants further deny that that the judge did not engage in**

**conversation with Blake or the J. Doe as both J. Doe and Blake testified that the judge**

**asked Blake and the J. Doe questions. (Joint Ex. G-1, 220:12-16; Joint Ex. S-1, 38:1-19,**

**39:1-9). Responding further, J. Doe testified that the judge also asked him if he was telling**

**the truth but does not remember how long he met with the judge or specifically the**

**conversation. (*ie.* sworn in). (Joint Ex. S-1, 38:1-5, Joint Ex. S-5, 176:17-25, 177:1-4). The**

**warrant application was also signed by J. Doe. (Joint Ex. B; Joint Ex. S-5 113:6-9; Joint**

**Ex. G-5, 364:16-19).**

71.    Jolliff-Blake and Herrera made judicial admissions that they did not represent to the judge that the "John Doe" witness was reliable, that his information was reliable, or that his information was truthful, and Jolliff-Blake testified that he did not tell the judge anything in addition to what is in the complaint and search warrant. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 41, 42, 43; Exhibit G-5 (Jolliff-Blake Dep Tr III) at 365.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the**

**determination of summary judgment. Subject to and without waiving the objection,**

**Defendants do not dispute this fact in part and dispute this fact in part. Defendants admit**

**that the above officers denied #41, #42 and #43 in requests to admit. Defendants deny**

**Office Blake testified that he did not tell the judge anything in addition to what is in the**

**complaint and search warrant. Blake could not recall whether he told the judge anything**

**in addition to what is in the complaint, what is in the search warrant, and what was on**

**the criminal history. (Joint Ex. G-5, 365:9-15).**

72.    Jolliff-Blake and Herrera did not tell Judge Chevere that they had no independent verification that Frederick Sutton lived at 827 South Keeler, that Sutton's criminal history included 30 arrests which consistently listed his home address since his first arrest in 1988 as 3938 West Lexington Street, that they had not performed any database checks with Accurint, the Cook County Assessor, the Recorder of Deeds, or the Secretary of State to determine the true ownership or occupancy of 827 South Keeler, and that the "John Doe" witness's

information about criminal activity had not been corroborated through an independent police investigation. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 45; Exhibit G-5 (Jolliff-Blake Dep Tr III) at 367.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to the wording "independent verification," and "corroborated through an independent police investigation" as argumentative, vague and undefined. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute it in part. Defendants admit only that the above officers admitted question # 45 in requests to admit. Defendants deny the remaining facts as Blake does not even recall if he accessed Accurint, Secretary of State, or Cook County Recorder prior to going to Judge Chevere to approve the warrant. (Joint Ex. G-1, 63:7-10, 64:22-24, 69:24-25, 70:1-2). Herrera also does not recall whether he or Blake checked these databases. (Joint Ex. M-2, 35:22-25).**

73.     Jolliff-Blake and Herrera knew that the "John Doe" witness was unreliable and that his information about criminal activity had not been corroborated through an independent police investigation, and although the information was not true, had not been verified, and was unverifiable, they presented false and incomplete information to the judge in order to obtain the search warrant and it was in reliance on that false and incomplete information that the judge signed the warrant. *Doc. 187, Third Am. Complaint ¶ 13, 14, 15, 27, 28, 29, 35 (No Answer[1]).*

**RESPONSE:  Defendants dispute this fact. There is no evidence in the record to support this statement and Plaintiffs' cite only their Complaint in which Defendants denied allegations in ¶¶ 13, 14, 15, 27, 28, 29, and 35.**

74.     The "John Doe" witness did not read the complaint that Jolliff-Blake had drafted before they all met with the judge and he does not know if he had a copy in front of him when the judge was reading it, and Jolliff-Blake did not hear the judge swear the "John Doe' witness in before he signed "J. Doe" on the complaint and warrant. *Exhibit G-1 (Jolliff-Blake Dep Tr I) at 136; Jt Exhibit S-5 ("John Doe" Dep Tr III - under seal) at 113, 115; Jt Exhibit G-5 (Jolliff-Blake Dep Tr III) at 365.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute this fact in part. Defendants admit only that J. Doe does not recall if he had a copy of the Complaint for Search Warrant in front of him when the judge was reading it, but the judge read it to him. Defendants deny that the J. Doe did not read the complaint Officer Blake had drafted. J. Doe was talking to Blake and providing him details as Blake typed up the complaint and Blake does not recall if J. Doe read over what he typed up. (Joint Ex. G-1, 136). Defendants deny Blake did not hear the judge swear J. Doe in. (Joint Ex. G-1, 22:6-7). The J. Doe was sworn in by the judge and signed the complaint. (Joint Ex. S-1, 38:1-5).**

<u>Execution of the warrant, detention, and scope of search</u>

75.    As soon as the search team consisting of Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins entered the Edwards residence at 827 South Keeler Avenue, they determined that there were no "indicators" that this was a drug house, and although by all appearances it was just a family home, Sgt. Sullins, the supervisor in charge, and Jolliff-Blake did not abandon the search, but Sullins told the team instead to use the "white glove" treatment and go lightly on the search. *Doc. 187, Third Am. Complaint ¶ 57 (No Answer[J]); Jt Exhibit M-1 (Herrera Dep Tr I) at 145-47.*

**RESPONSE: Defendants object to this fact as argumentative. Subject to and without waiving the objection, Defendants dispute this fact. Sgt. Sullins did not tell the team to use the "white glove" treatment, never had a concern they were in the wrong house, and never had any concern that 827 South Keeler was not a drug house. (Joint Ex. Q, 138:25, 139:1-25; Joint Ex. G-1, 235:23-25, 236:1-12). In fact, the police canine had positive hits for detection of narcotics. (Joint Ex. Q, 141:18-25). Blake also had no concern that they were in the wrong house. (Joint Ex. G-1, 237:21-24, 238:1-5).**

76.    Although the home appeared different than the description in the complaint for the search warrant, that is, a) the gate to the fence into the back yard of the Edwards home was

locked with a padlock, giving no easy access into the back yard and, in fact, the lock had to be cut for the officers to enter, b) there was no back door leading to a basement, and c) the basement was a very small, cramped, cluttered storage area, not a site to run a drug operation, the search was not abandoned by Sgt Sullins, who with input from Jolliff-Blake, would have had the authority to abandon the search. *Doc. 187, Third Am. Complaint ¶ 57 (No Answer[1]); Jt Exhibit G-1 (Jolliff- Blake Dep Tr I) at 237-41; Jt Exhibit D (Sherri Edwards Dep Tr) at 46-49; Pls Exhibit 7 (Picture of Basement in Edwards home).*

**RESPONSE: Defendants object to this fact as speculation, conjecture, opinion, conclusory, and argumentative. Subject to and without waiving the objection, Defendants do not dispute this fact in part and dispute this fact in part. Defendants admit only that there was a padlocked chain on the back gate that officers had to cut. Defendants deny the home appeared different than the description in the complaint and all the other remaining convoluted statements in this paragraph. (Joint Ex. G-1, 237-247). Blake or Sullins never had any concern they were in the wrong house, and never had any concern that 827 South Keeler was not a drug house. (Joint Ex. Q, 138:25, 139:1-25; Joint Ex. G-1, 237:21-24, 238:1-5).**

77.    Defendants have made judicial admissions that plaintiffs told defendants that a "Freddy Sutton" did not live at their home, but defendants nevertheless called in a canine and continued searching the whole house for approximately two hours, with plaintiffs continuing to insist that defendants had the wrong home, and asking them to leave already. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 44, 47, 48, 52, 53 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter (43 and 44), Reed (47 and 48), and Sullins (52 and 53) at # 48, 52, 53, 61, 64, 70; Jt Exhibit D (Sherri Edwards Dep Tr) at 46, 49-52.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to this statement as argumentative. Subject to and without waiving the objection, Defendants do not dispute only that they admitted requests to admit noted above. Defendants dispute they were in the wrong home and the remaining facts. Blake or Sullins never had any concern they were in the wrong house, and never had any concern that 827 South Keeler was not a drug house.**

**(Joint Ex. Q, 138:25, 139:1-25; Joint Ex. G-1, 237:21-24, 238:1-5).**

78.    Defendants have made judicial admissions that they found nothing indicating that a Freddy Sutton lived at the Edwards home (e.g., no proof of residence for him), and they found no indication whatsoever that there was a drug operation being run out of the home, leading one officer to say, according to plaintiff Shawna Edwards: "We've been bamboozled again." *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 74, 75, 76; Jt Exhibit G-1 (Jolliff-Blake Dep Tr I) at 236; Jt Exhibit M-1 (Herrera Dep Tr I) at 152, 162;  Jt Exhibit E (Shawna Edwards Dep Tr) at 23.*

**RESPONSE: Defendants object to this fact as irrelevant and immaterial to the determination of summary judgment. Defendants further object to this statement as characterized by "whatsoever," "according to plaintiff Shawna Edwards," "drug operation," and "leading one officer to say," as argumentative and inappropriate. Subject to and without waiving the objection, Defendants admit this fact in part and deny this fact in part. Defendants admit only that no contraband was recovered, no item of evidence was taken from 827 south Keeler, and no proof of residency was found for Freddy Sutton as answered in requests to admit. Defendants dispute that any officer ever said anything about being "bamboozled," and that there was ever a conversation about being in the wrong house. (Joint Ex. G-1, 249:18-19; Joint Ex. H, 70:13-18; Joint Ex. N, 91:20-22; Joint Ex. P, 84:6-8). Blake or Sullins never had any concern they were in the wrong house, and never had any concern that 827 South Keeler was not a drug house. (Joint Ex. Q, 138:25, 139:1-25; Joint Ex. G-1, 236:10-12, 237:21-24, 238:1-5).**

79.    While the search took place, Shawna Edwards and Shawna Walker were detained in their living room under the guard of an officer, and plaintiffs Nelson Edwards and Sherri Edwards were outside, asking to be allowed into their home, but being physically prevented by police officers from entering their home, with the elderly Nelson Edwards being shoved by an officer. *Pls Exhibits 11, 15, 19, 23, 27, 31, 35, 39, 43, 47, 52 (Judicial Admissions to Req. to Admit by, respectively, Jolliff-Blake, Bracho, Beluso, Sanchez, Lagunas, Buckner, Herrera, Cantore, Carter, Reed, and Sullins) at # 65;  Doc. 187, Third Am. Complaint ¶ 17, 18, 20 (No Answer[1] ); Exhibit G-1 (Jolliff-Blake Dep Tr) at 242-43, 249-51; Jt Exhibit D (Sherri Edwards*

*Dep Tr) at 17-24; Jt Exhibit C (N Edwards Dep Tr) at 17-21.*

    **RESPONSE: Defendants admit this fact in part and deny it in part. Defendants admit that Shawna Edwards and Shawna Walker were detained in their living room under the watch of an officer and that Nelson Edwards and Sherri Edwards were outside at some point and asked to get into the home. Defendants deny that Nelson Edwards and Sherri Edwards were being physically prevented from entering their home, but told they could not enter. (Joint Ex. C, 17:22-25, 18:1-6; Joint Ex. V, 22:4-11). Defendants deny the characterization that Nelson Edwards was shoved as Nelson Edwards testified he initiated the contact by running into the officer's hand. (Joint Ex. C, 16:13-17, 20:2-10, 20:15-23, 32:19-25, 33:1-2). The officer who stopped Mr. Edwards from entering the house "was real nice" to Mr. Edwards. (Joint Ex. V, 19:28, 20:1-5). Not a single person every saw Nelson Edwards get shoved. In fact, James McElroy, who was right next to Mr. Edwards when the officer stopped him from entering the house, did not see any officer push Mr. Edwards. (Joint Ex. V, 40:12-22).**

Possible attempt at cover-up[3]

    80.   Either in June 2013 or thereafter, after this action against Jolliff-Blake and others was commenced on June 20, 2013, Jolliff-Blake made the "John Doe" witness into a protected Registered Cooperating Individual; however, with regard to drug purchase activity, the RCI file for the "John Doe" witness contains only information about two controlled buys the "John Doe" witness allegedly made to become an RCI, with no further drug purchase activity documented in the file thereafter. *Doc. 1 (Original Complaint); Jt Exhibit G-5 (Jolliff-Blake Dep Tr III) at 339- 44.*

    **RESPONSE: Defendants object to this fact statement because it is not appropriate for a statement of undisputed facts for summary judgment as it not a fact related to the underlying issues in this case and completely irrelevant and immaterial to the**

---

[3] This heading is plainly argumentative and inappropriate.

**determination of summary judgment. This Court has ruled on the irrelevance of RCI file multiple times. Despite those rulings, Plaintiffs continue to advance conspiracy theories. Defendants further object to this statement as conjecture, speculation, and argumentative, therefore, move to strike. Subject to and without waiving the objection, Defendants dispute the RCI file was created after this action or for any alternate purpose. The Court has access to the RCI file which is now in the Court's possession filed under seal and can confirm the absurdity of this assertion.**

Dated: June 20, 2016                                        Respectfully submitted,


                                                            s/ James V. Daffada
                                                            James V. Daffada
                                                            Attorney for Defendants

Thomas M. Leinenweber
James V. Daffada
Kevin E. Zibolski
Leinenweber Baroni & Daffada LLC
203 N. LaSalle Street Suite 1620
Chicago, Illinois 60601
(866) 786-3705
Attorney No. 39795

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that I have served copies on all parties of record via the Court's electronic filing system on this 20th day of June, 2016.

                                                            s/Kevin Zibolski
                                                            Kevin Zibolski